**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CHRISTOPHER CALHOUN,<br>*Plaintiff*, | : | 3:23-CV-1453 (SVN) |
| v. | : | |
| UCONN HEALTH, *et al.*,<br>*Defendants*. | : | September 28, 2026 |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Sarala V. Nagala, United States District Judge.

Plaintiff Christopher Calhoun, a sentenced inmate in the custody of the Connecticut Department of Correction ("DOC"), brought this action *pro se* alleging that medical providers at UConn John Dempsey Hospital ("UConn") violated and conspired to violate his Eighth Amendment rights by acting with deliberate indifference to his serious head injury. After initial review, the Court allowed Plaintiff to proceed on the following individual capacity claims: (1) direct Eighth Amendment and conspiracy to violate constitutional rights claims against Dr. Natalie J. Moore; (2) direct Eighth Amendment claims against RN John McMahon, Dr. Heather L. Sibley, and PA Carly B. Roy; and (3) conspiracy to violate constitutional rights claims against Dr. Moore, RN Nicole Belanger, PA-C Ersilda Ajce, and Dr. Douglas W. Gibson. Initial Review Order Am. Compl. ("IRO"), ECF No. 15 at 11–12. All other claims were dismissed. *Id.*

Defendants have now moved for summary judgment as to all of Plaintiff's remaining claims. For the following reasons, Defendants' motion, ECF No. 203, is **GRANTED.**

# I. FACTUAL BACKGROUND

The following relevant facts are taken from Defendants' Local Rule 56(a)1 Statement, Plaintiff's amended complaint,[1] and the underlying evidentiary record.[2] All the facts set herein are undisputed unless otherwise indicated, and disputes are noted only if supported by evidence in the record.

Defendants are all medical providers at UConn. Defs.' L.R. 56(a)(1) St., ECF No. 203-2 ¶ 1. Plaintiff's claims against Defendants stem primarily from his medical treatment, or alleged lack thereof, after he was assaulted by other inmates while housed at MacDougall-Walker Correctional Institution ("MacDougall"). *See* Am. Compl., ECF No. 14; ECF No. 203-2 ¶ 3. Specifically, Plaintiff's claims are based on the belief that he suffered a depressed skull fracture on November 16, 2021, and that Defendants were deliberately indifferent in failing to diagnose

[1] Although a verified complaint may be treated as an affidavit for summary judgment purposes provided that it meets the other requirements of Federal Rule of Civil Procedure 56(c), *see Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004), Plaintiff's complaint is not verified. The standard for verification comes from 28 U.S.C. § 1746, which requires that a declarant in the United States include the following text in "substantially" the same form, along with date and signature: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct." *See, e.g., Conquistador v. Hurdle*, No. 20-CV-01658 (KAD), 2022 WL 17821097, at *3 n.4 (D. Conn. Dec. 20, 2022) (concluding that complaint that did not include verification that it was made under penalty of perjury did not qualify); *Rickett v. Orsino*, No. 10 CIV. 5152 (CS) (PED), 2013 WL 1176059, at *2 n.5 (S.D.N.Y. Feb. 20, 2013) (concluding that complaint submitted under penalty of perjury qualified). Plaintiff's amended complaint contains no statement that it was submitted under penalty of perjury; indeed, it is not signed in any manner. *See* ECF No. 14 at 13. Accordingly, the Court will refer to Plaintiff's amended complaint for the purpose of background and discussing his claims, but not as an affidavit opposing Defendants' summary judgment motion.

[2] Defendants informed Plaintiff of his obligation to respond to the motion for summary judgment and the contents of a proper response, *See* Not. to Pro Se Litigant, ECF No. 203-3, but Plaintiff has not filed a Local Rule 56(a)2 Statement responding to Defendant's Local Rule 56(a)1 Statement. He has only filed a memorandum in opposition to the motion, ECF No. 240, and attached exhibits, ECF No. 240-1. Defendants request that the Court deem admitted all the statements of fact in their Local Rule 56(a)1 Statement because of Plaintiff's failure to comply with Local Rule 56(a)2. Defs.' Reply, ECF No. 241 at 1; *see also* Local Rule 56(a). That Plaintiff is unrepresented does not excuse him from complying with the Court's procedural and substantive rules. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006); *see also Small v. Clements*, No. 3:18-CV-01731 (KAD), 2019 WL 5727388, at *1 n.1 (D. Conn. Nov. 5, 2019) (deeming uncontroverted facts admitted where a litigant failed to file a responsive statement of facts). Thus, the facts contained in Defendants' Local Rule 56(a)1 statement, where supported by record evidence, are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)3. However, where possible, the Court takes facts directly from Plaintiff's medical records, Defendants' declarations, and any remaining record evidence.

the skull fracture and treat his injury, and conspired to alter his medical records to hide their own treatment deficiencies and protect the DOC. *See generally* ECF No. 15.

A. Plaintiff's Injury & November 16, 2021, Emergency Room Visit

On November 16, 2021, while Plaintiff was in the recreation yard at MacDougall, other inmates struck him in the back of his head while his hands were cuffed behind his back, causing him to fall forward and strike the concrete with his forehead. ECF No. 14 at 5 ¶ 1. Plaintiff was evaluated by prison medical staff, and then transported to UConn by a DOC transport vehicle, rather than an ambulance. *Id.* ¶ 3. Plaintiff arrived at UConn hospital at 8:07 p.m., Pl.'s Med. Rec., ECF No. 203-4 at 6, approximately ninety-four minutes after the assault, ECF No. 14 at 5 ¶ 3. Nurse Belanger was assigned as Plaintiff's registered nurse, PA Ajce was assigned as Plaintiff's physician's assistant, and Dr. Moore was assigned as Plaintiff's attending provider. *See* ECF No. 203-4 at 11–12, 15.

Plaintiff's medical records reflect that PA Ajce's first provider evaluation occurred at that at 8:14 p.m. *Id.* at 12. Nurse Belanger then saw Plaintiff in the emergency room triage area at approximately 8:16 p.m. *Id.* at 11-14.[3] Plaintiff told Nurse Belanger that he was assaulted from behind and did not recall anything except waking up in a prison holding cell by himself. ECF No. 14 at 7 ¶ 6. He also alleges that he complained to Nurse Belanger of a migraine headache, nausea dizziness, and "a huge black spot in his memory." *Id.* Nurse Belanger recorded Plaintiff's chief complaint as a "headache," and also noted that he had lost consciousness. ECF No. 203-4 at 6, 13. The provider notes, which were recorded by PA Ajce and attested to by Dr. Moore, documented that Plaintiff presented with an "extremely large hematoma overlying his left eye," and he had significantly reduced vision in his left eye, but that he normally wears glasses and did not have

[3] Nurse Belanger's duties consisted of carrying out and assisting others in carrying out orders by those with the authority to enter them, such as doctors and physician's assistants. Belanger Decl., ECF No. 203-10 ¶¶ 9–10.

them for the visual acuity test. *Id*. at 8. It was also documented that Plaintiff had reported that he "was jumped," that he was "unsure if he lost consciousness or not," and that he had "significant pain in his head[,] especially on the left side where he ha[d] a large hematoma." *Id*.

At 8:24 p.m., PA Ajce ordered a CT scan without intravenous ("IV") contrast for Plaintiff's head, facial bones, and spine. *Id*. at 14. She also ordered a visual acuity screening and Tylenol for Plaintiff, as well as an X-ray for Plaintiff's right hand. *Id*. at 15. Nurse Belanger provided Plaintiff with Tylenol after it was ordered by PA Ajce. *Id*. at 16. In Nurse Belanger's triage notes, she wrote, "Pt from DOC, reports 'I was jumped' by fellow inmate. + LOC. Pt arrives with large abrasion and swelling above left eye and to left side of forehead. A&OX4. No N/V." *Id*. at 11, 13. The "+LOC" is an abbreviation that Plaintiff lost consciousness. ECF No. 203-2 ¶ 19; ECF No. 203-10 ¶ 11. Plaintiff's medical records show that Nurse Belanger saw Plaintiff again at 8:50 p.m., and she gave Plaintiff more Tylenol. ECF No. 203-4 at 30–31.

The CT scans of Plaintiff's head, facial bones, and cervical spine began at 8:43 p.m., *id*. at 22, 24–25, 27, and the preliminary results of all three scans were available by 9:16 p.m., *id*. at 17. Dr. Gibson, who has been employed as a physician in Diagnostic Radiology by the University of Connecticut Health Center and is an Assistant Professor of Radiology with the UConn School of Medicine since 2010, reviewed Plaintiff's CT scans. Gibson Decl., ECF No. 203-11 ¶¶ 3–4, 10. He attests that a CT brain scan without IV contrast is the primary imaging modality and often preferred technique for evaluating acute conditions like head trauma, because it allows for quick assessment of bleeding or other acute intracranial processes. *Id.* ¶ 11. The findings from the CT Head scan were written as follows: "Brain "Minimal Atrophy. No intracranial hemorrhage. No mass. No edema. . . . Cerebral ventricles: No hydrocephalus. . . . Bones/joints: No acute fracture. . . . Soft tissues: Tiny dermal calcification or foreign body. There is focal swelling in the left

forehead and left frontal region as well as around the left orbit." ECF No. 203-4 at 23. Dr. Gibson's final impressions of the brain scan were: "[n]o intracranial hemorrhage" and "large left-sided scalp hematoma." *Id.*; ECF No. 203-11 ¶ 15.

The findings from Plaintiff's facial bones scan were written as follows: "Orbits: No evidence of orbital fracture. Large left frontal subcutaneous hematoma is present, extending to the superior aspect of the left orbit." ECF No. 203-4 at 25. Dr. Gibson's final impression of the CT scan stated: "No CT evidence of facial bone fracture. Partially imaged large left frontal subcutaneous hematoma." *Id.*; ECF No. 203-11 ¶ 18. Dr. Gibson's findings from Plaintiff's cervical spine scan were, in relevant part, as follows: "No acute fracture is seen." ECF No. 203-4 at 28. Likewise, the findings from the hand X-ray showed no fractures or dislocation. *Id*. at 30. In summary, the CT head and CT face scans were "performed without any abnormalities" and the scans were "all remarkable." *Id*. at 8, 10.

At 9:14 p.m., Dr. Moore, who was assigned as Plaintiff's attending physician, ordered an ocular "ED point-of care ultrasound[,]" and she performed the exam. *Id*. at 15, 19–20. The "indication for ultrasound" was "L eye blurry vision[,]" *id*. at 19, and the ultrasound showed that a "vitreous detachment" and "vitreous hemorrhage" were absent, *id*. at 21.

Ultimately, Plaintiff was discharged at 10:08 p.m. with instructions to return to see the ophthalmology department the next day. *Id*. at 10, 19.

B. November 21, 2021, UConn Emergency Room Visit

On November 21, 2021, Plaintiff returned to the UConn emergency room at 1:40 p.m. *See* Pl.'s Med. Rec., ECF No. 203-5 at 3. RN McMahon was assigned as Plaintiff's nurse, PA Roy was assigned as Plaintiff's physician's assistant, and Dr. Sibley was assigned as his attending provider. *Id*. at 8, 11. PA Roy completed a "First Provider Evaluation of Patient" within five

minutes of his arrival. *Id*. at 8. Nurse McMahon started to triage Plaintiff, and he documented that Plaintiff had stated that since the incident, he had "been dizzy, worse when lying down, migraines intermittently, and nausea which ha[d] been under control with Zofran[.]" *Id*. at 8–9. On a scale of 0 to 10, Plaintiff's pain was documented as a 10, and Plaintiff had a "[h]ealing wound above left eye" and "[b]ruising around right eye." *Id*. at 10–11.

Plaintiff's medical records, which were recorded by PA Roy and attested to by Dr. Sibley, state that he was sent to the emergency room by the DOC "for reevaluation as he had continued left-sided headache, nausea, vomiting, photophobia and dizziness since head injury. . . ." *Id*. at 4. Under the comments section of Plaintiff's medical records, it was documented that Plaintiff had a "left subconjunctival hemorrhage. . . . Healing hematoma and abrasion to the left forehead." *Id*. at 6. Under "Number of Diagnoses or Management Options[,]" it was charted, "Will order head CT to rule out subdural hematoma that may have developed and check labs with IV hydration. . . [P]atient may be dehydrated causing decreased urine output as he states he has not been eating or drinking much due to nausea vomiting." *Id*. at 7.

PA Roy ordered a CT head scan without IV contrast for Plaintiff. *Id*. at 11. Dr. Baldwin reviewed Plaintiff's head CT scan, and as part of his review, he also evaluated the CT scan images that were taken on November 16, 2021, for comparison.[4] *Id.* at 22; Baldwin Decl., ECF No. 203-17 ¶ 11. Like Dr. Gibson, Dr. Baldwin attests to that a CT brain scan without IV contrast is the preferred imaging technique for Plaintiff's type of injury. *Id.* ¶ 12. Dr. Baldwin "found an interval decrease in prominence of a known left frontoparietal, intracalvarial, soft tissue hematoma and near complete interval resolution of right parieto-occipital scalp hematoma." *Id.* ¶ 13. A "decrease

[4] Dr. Baldwin has been employed as an attending physician in Diagnostic Radiology by the University of Connecticut Health Center since 2013, and has been an Associate Professor of Radiology with the UConn School of Medicine since 2013. Baldwin Decl., ECF No. 203-17 ¶¶ 3–4. He also serves as Assistant Residency Program Director and Radiology Clerkship Director. *Id.* ¶ 4. Dr. Baldwin is not named as a Defendant in this action.

in prominence" of a hematoma, which is a swelling of clotted blood between tissue, "means the hematoma is decreasing in size because the blood is being absorbed by the body in the natural course of recovery." *Id*. ¶¶ 14–15. Dr. Baldwin did not observe any evidence of a skull fracture in either the November 22, 2021, CT scan images or the November 16, 2021, CT scan images. *Id*. ¶ 17.

PA Roy prescribed Reglan and Toradol injections to treat Plaintiff's nausea and pain. ECF No. 203-5 at 12. Plaintiff's medical notes indicate that he refused the Reglan and Toradol injections, so PA Roy discontinued those orders and instead prescribed him Tylenol, Ibuprofen, and Zofran. ECF No. 203-5 at 12–13, 23–26. PA Roy also ordered bloodwork for Plaintiff. *Id*. at 14. At 6:25 p.m., Nurse McMahon gave Plaintiff an IV of sodium chloride bolus, *id*. at 14, which had been ordered by PA Roy, *id*. at 13, 24–25. Plaintiff alleges that PA Roy only provided him with IV fluids after he had requested them even though she had been aware that he had not urinated or had a bowel movement since November 16, 2021, the date of the incident. ECF No. 14 at 10 ¶ 18.

In the medical records, which were signed by both PA Roy and Dr. Sibley, it was documented that there was "no new intracranial bleeding/subdural hematoma visualized on repeat head CT done today. Patient has concussive symptoms. Continue brain rest by limiting brain stimulation. Alternate ibuprofen/Tylenol for pain. Zofran for nausea/vomiting. Return for any new or worsening symptoms." ECF No. 203-5 at 17, 27. Plaintiff's laboratory results were also "within normal limits." *Id.* at 27. Plaintiff was discharged. *Id*. at 7.

C. November 2021 Visits with DOC Medical

On November 24, 2021, a few days after Plaintiff had returned from UConn for the second time, he saw non-Defendant Sarah Schauer, an Advance Practice Registered nurse for the DOC.

*See* Pl.'s DOC Med. Rec., ECF No. 203-8 at 1; Schauer Decl., ECF No. 203-15 ¶ 2. APRN Schauer documented that she discussed the most recent ER visit with Plaintiff, and given that there was "no evidence of intracranial bleeding[,]" she felt comfortable ordering him ibuprofen to take as needed, and she would continue to monitor him. ECF No. 203-8 at 1. On November 29, 2021, Plaintiff returned to medical, where he saw DOC Nurse Schauer once again. *See id*. at 2-4. APRN Schauer documented that Plaintiff stated that he had "intermittent migraines[,]" but that he had not taken ibuprofen because he was not aware he had an order for it; that he continued to have headaches and dizziness; that he did feel a bit better but was "not back to baseline"; and that he had been "eating and drinking" and much hungrier lately. *Id*. at 2.

Plaintiff also expressed concerns that was "a 'dent' in the L frontal part of his skull," and he was worried he may "have a broken or protruding part to his L frontal skull." *Id*. APRN Schauer documented that Plaintiff was "convinced he has crack or dent to his L frontal bone of scalp, there is a depression in this area but likely d/t surrounding tissue edema giving the impression he has an underlying scalp abnormality." *Id*. at 3-4. APRN Schauer did not suspect a fracture, ECF No. 203-15 ¶ 8, but she still ordered an X-ray for further evaluation, and Plaintiff had an X-ray that same day, *see* ECF No. 203-8 at 4, 6.

D. Dr. Gibson's X-Ray Interpretation & Subsequent Revision & Dr. Baldwin's Review

On December 9, 2021, Dr. Gibson was asked to review four X-ray images of the Plaintiff's bony calvarium, the bones of the skull that exclusively cover and protect the brain, that were taken on November 29, 2021. Gibson Decl., ECF No. 203-11 ¶ 26.

The X-ray report is written as follows: "Clinical History: Radiographer's technology note as follows: depression to L forehead area. s/p assault, likely d/t surrounding soft tissue swelling." . . . "Findings: . . . 4 images of the bony calvarium were performed with the patient's head rotated

on 3. A depressed skull fractures are identified. Difficult to evaluate the facial bones due to rotation." *See* X-ray Rep., ECF No. 203-6 at 2. Under "Impression[,] Dr. Gibson wrote, "Limited evaluation. *No depressed skull fracture identified*. Additional imaging may be warranted." *Id*. (emphasis added). Under "Comment[,]" Dr. Gibson wrote, "Would recommend additional clinical evaluation and if necessary additional imaging of the bony calvarium." *Id*. In his declaration submitted for the present motion, Dr. Gibson attests that he "did not identify any evidence of a depressed skull fracture on any" of the X-rays taken November 29, 2021. ECF No. 203-11 ¶ 26.

Sometime after December 2021, Dr. Gibson discovered that his report contained a scrivener's error. *Id.* ¶ 27. Specifically, while his report correctly noted, "[n]o depressed skull fracture identified," it also wrongly contained the following (grammatically incorrect) sentence: "A depressed skull fractures are identified." *Id*. Dr. Gibson believes the error was the result of a transcription error related to the use of dictation software, which he states frequently drops words and sounds in the transcription process. *Id*. ¶ 28.

To correct the error, on March 17, 2023, Dr. Gibson noted in the Plaintiff's medical records that a change in his report was warranted due to "WORD RECOGNITION ERROR." *Id*. ¶ 29. Dr. Gibson then explained that the sentence which read, 'A depressed skull fractures are identified' should have read as: 'No depressed skull fractures are identified.'" *Id*. ¶ 29. Dr. Gibson attests that consistent with standard practices for maintaining medical records, he did not delete the scrivener's error, but instead added the note explaining what had happened. *Id*. ¶ 30.

Dr. Baldwin, at the request of counsel for Defendants, also independently reviewed the four X-rays taken of Plaintiff's bony calvarium taken on November 9, 2021. ECF No. 203-17 ¶ 19. Dr. Gibson found no evidence of a skull fracture or other acute intracranial processes, and

found that the four X-rays were consistent with Plaintiff's CT scans from November 16, 2021, and November 22, 2021. *Id*. ¶¶ 20–21.

E. Subsequent Visits with DOC Medical & UConn Neurology

On December 10, 2021, Plaintiff again met with APRN Schauer, who informed him that his recent X-ray was normal and that he should plan to see a neurologist as they had discussed. *See* ECF No. 203-8 at 5. On December 13, 2021, Plaintiff saw Nurse Hollie, another DOC nurse, and she advised Plaintiff that the X-Ray results of his head were normal. *Id*. at 9. Later that day, Plaintiff also saw APRN Schauer, who noted that Plaintiff had been in medical observation for several weeks, and he had an upcoming neurology appointment to discuss continuing "migraines and auditory hallucinations (buzzing in ears)." *Id*. at 7. APRN Schauer also documented that Plaintiff reported he would likely refuse the neurology appointment "as they will likely say to him that nothing is wrong," and that he was "very preoccupied with the 'dent' that is in the L side of his front skull. He has had 2 CT scans and 1 x-ray that show there is no damage to this area of the skull and the 'dent' is likely [due to] surrounding soft tissue swelling or soft tissue injury that is healing." *Id*.

On December 15, 2021, Plaintiff returned to UConn hospital and was seen by Dr. Mittal, a neurologist.[5] ECF No. 14 at 11 ¶ 21. The day after Plaintiff's appointment with Dr. Mittal, he was seen in the DOC infirmary unit, and he reported to APRN Schauer he was feeling better but he still had intermittent dizziness and "h/a's" [headaches]. ECF No. 203-8 at 11. APRN Schauer reported that Plaintiff had a normal neurology exam in which the neurologist had explained to Plaintiff that his current symptoms were normal for the type of injury he had sustained, but that his symptoms should gradually get better, although headaches, dizziness and nausea could last

[5] The Court dismissed Plaintiff's claims against defendant Mittal on initial review of Plaintiff's Amended Complaint. *See* IRO, ECF No. 15 at 11.

from six to eight weeks or up to three months. *Id*. The medical notes also state that the neurologist had recommended an MRI for further evaluation to rule out any other underlying causes of headaches and dizziness, and the MRI was ordered. *Id*. at 12. Plaintiff was then discharged from the DOC infirmary setting because he no longer required continued medical monitoring. *Id*. at 11.

## II. RELEVANT PROCEDURAL HISTORY

As noted above, the IRO allowed Plaintiff to proceed against Dr. Moore on both a direct Eighth Amendment claim and a claim of conspiracy to violate constitutional rights; against Defendants Belanger, Ajce, and Gibson on a conspiracy claim only; and against Defendants McMahon, Sibley, and Roy for a direct Eighth Amendment claim only. ECF No. 15 at 11–12. Plaintiff had the assistance of *pro bono* counsel during discovery to assist him if he was having difficulty accessing discovery or contacting an expert, but the Court clarified that it was not *pro bono* counsel's role to identify and retain an expert. Order, ECF No. 155.

Defendants now move for summary judgment on the grounds that Plaintiff cannot prove his direct Eighth Amendment deliberate indifference claims, nor can he prove any indirect claims for conspiracy, because Defendants provided objectively adequate medical care to Plaintiff, and thus Defendants are entitled to judgment as a matter of law. No. 203 at 1. Plaintiff opposes the motion—though, as noted above, his submissions are deficient. *See* ECF Nos. 203.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the

dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial." *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001). "It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with specific evidence—beyond "conclusory allegations or unsubstantiated speculation"—that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249; *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable

inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Moreover, the Court bears in mind that a *pro se* litigant's filings must be liberally construed to raise the strongest arguments they suggest. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *see also Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (collecting cases regarding the "special solicitude" afforded to *pro se* litigants).

## IV. DISCUSSION

The Court concludes that Defendants are entitled to summary judgment on all of Plaintiff's claims. Defendants' motion for summary judgment is therefore GRANTED in full.

### A. Deliberate Indifference to Medical Needs

First, the Court concludes that no reasonable jury could find in Plaintiff's favor on his Eighth Amendment deliberate indifference claim against Dr. Moore, Nurse McMahon, Dr. Sibley, and PA Roy.

#### *1. Legal Standard*

"The Eighth Amendment prohibits the infliction of 'cruel and unusual punishments.'" *Walker*, 717 F.3d at 125 (quoting U.S. Const. amend. VIII). "Although the Constitution does not require 'comfortable' prison conditions, the conditions of confinement may not 'involve the wanton and unnecessary infliction of pain.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981)). To establish an Eighth Amendment claim regarding inadequate medical treatment, Plaintiff must present evidence "showing the offending official's 'deliberate indifference to [his] serious medical needs.'" *Thomas v. Wolf*, 832 F. App'x 90, 92 (2d Cir. 2020) (quoting *Hill v.*

*Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). Deliberate indifference exists when an official "knows that [an] inmate[] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). It requires "more than negligence, but less than conduct overtaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). The standard for deliberate indifference to inmate health or safety includes both subjective and objective components. *See Farmer*, 511 U.S. at 834.

The first component is objective, requiring the prisoner to demonstrate that the alleged deprivation of medical care was "'sufficiently serious.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The inmate must "show that he was 'actually deprived of adequate medical care' by an official's failure 'to take reasonable measures in response to a [sufficiently serious] medical condition.'" *Thomas*, 832 F. App'x at 92 (brackets in original) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006), *abrogated on other grounds as recognized by Kravitz v. Purcell*, 87 F.4th 111, 119, 122 (2d Cir. 2023)).

Establishing an objectively serious deprivation requires the court to make two separate inquiries. First, the Court must determine whether the inmate "was actually deprived of adequate medical care." *Salahuddin*, 467 F.3d at 279. The medical providers are only required to have "act[ed] reasonably." *Id.* (quoting *Farmer*, 511 U.S. at 845). Second, the Court must determine "whether the inadequacy in medical care is sufficiently serious," which requires examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 280. As Defendants do not contest that Plaintiff suffered an objectively serious deprivation, *see* ECF No. 203-1 at 13, the Court does not elaborate further on the legal standard to establish this element.

The second element of a deliberate indifference claim is subjective. "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety,'" which is "a state of mind 'equivalent to the familiar standard of recklessness' as used in criminal law." *Smith*, 316 F.3d at 184 (*quoting Chance*, 143 F.3d at 702, and then *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002)). Deliberate indifference claims based on a delay in treatment are "difficult to establish." *Oh v. Saprano*, No. 3:20-CV-237 (SRU), 2020 WL 4339476, at *4 (D. Conn. July 27, 2020) (collecting cases). The Second Circuit has noted that such claims have typically been reserved for cases where, for, example prison "officials deliberately delayed care as a form of punishment," "ignored a 'life-threatening and fast-degenerating' condition for three days," or "delayed major surgery for over two years." *Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233, *2 (2d Cir. 1999) (summary order).

Importantly, allegations constituting negligence or medical malpractice are insufficient to support an Eighth Amendment deliberate indifference claim. *Thomas*, 832 F. App'x at 92–93 (citing *Hathaway*, 99 F.3d at 553). "A plaintiff cannot establish a claim of deliberate indifference on a theory that the defendant failed to take some available alternative or additional diagnostic techniques or forms of treatment when the defendant's decision is based on sound medical judgment." *Clark v. Quiros*, 693 F. Supp. 3d 254, 286 (D. Conn. 2023) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). Nor does a bad or incorrect diagnosis constitute deliberate indifference. *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000) ("the mere malpractice of medicine," including "a delay in treatment based on a bad diagnosis," is not deliberate indifference); *see also Estelle*, 429 U.S. at 106 ("A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.") So long as "medical judgment was consciously exercised, even if that judgment

was 'objectively unreasonable,'" a defendant's actions do "not constitute deliberate indifference." *Parks v. Blanchette*, 144 F.Supp.3d 282, 315 (D. Conn. Nov. 4, 2015) (quoting *Salahuddin*, 467 F.3d at 280). Moreover, a patient's disagreement with the treatment provided does not rise to the level of deliberate indifference. *See Wright v. Rao*, 622 F. App'x 46, 47 (2d Cir. 2015) (citing *Chance*, 143 F.3d 698, 703 (2d Cir. 1998)).

Here, as noted above, Defendants do not contest that Plaintiff's head injury constituted a serious medical need when he arrived at UConn on November 16, 2021. Rather, Defendants Dr. Moore, PA Roy, Nurse McMahon, and Dr. Sibley submit that they were not deliberately indifferent to Plaintiff's medical needs. *See id.* For the reasons explained below, the Court agrees.

*2. Dr. Moore*

First, Dr. Moore was not deliberately indifferent.

Plaintiff's claim proceeded against Dr. Moore on the basis that Dr. Moore failed to properly assess Plaintiff's injuries and failed to properly treat Plaintiff by choosing to order a CT scan, instead of an X-Ray or MRI. *See* IRO, ECF No. 15 at 9. Plaintiff also appears to claim that Dr. Moore (and other Defendants) were deliberately indifferent by failing to give him IV fluids. *Id*. at 3.

As an initial matter, Plaintiff's medical records indicate that it was PA Ajce that ordered the CT scans for Plaintiff, and that Dr. Moore, as the attending physician, oversaw PA Ajce's medical treatment. *See* ECF No. 203-4 at 8, 14–15. Even so, Plaintiff presents no evidence to demonstrate that Dr. Moore was aware of a substantial risk of harm to Plaintiff and consciously disregarded that risk.

Dr. Moore submits that a CT scan is the preferred diagnostic tool for head injuries similar to the injuries suffered by Plaintiff, because a CT scan images bones better than X-rays and can

show intercranial bleeding. Moore Decl., ECF No. 203-13 ¶ 10. Dr. Moore further submits that an MRI is not the preferred tool for injuries like Plaintiff's and was not the required standard of care, and that, had Dr. Moore thought an MRI was required, she would have ordered one. *Id.* ¶¶ 11–12. Dr. Moore also submits that she treated Plaintiff based on the report from the radiologist who reviewed the CT scan images, because she does not read CT scans. *Id.* ¶¶ 12–13. Additionally, Dr. Moore attests that, had there been a depression under the hematoma that was overlying Plaintiff's left eye as Plaintiff alleges, it would not have been visible to Dr. Moore during her physical examination of Plaintiff, because it would have been under the hematoma.[6] *Id.* ¶ 15.

Dr. Moore further avers that her decision not to order the administration of IV fluids for Plaintiff was because his medical condition did not require it. *See id.* ¶¶ 18–19. She attests that IV fluids can lead to an electrolyte imbalance when given unnecessarily, and that typically, IV fluids are administered in cases of severe dehydration, low blood pressure, infection, sepsis and potentially vomiting. *Id.* ¶¶ 16–17.

Here, Plaintiff has offered no evidence—expert or otherwise—to contradict Dr. Moore's assertions, or to support his claim that Dr. Moore's treatment of Plaintiff was deliberately indifferent to his serious medical needs. Instead, the record before the Court demonstrates that Dr. Moore's choice of treatment, *i.e.*, the decisions to order a CT scan for Plaintiff's head trauma and not to provide IV fluids, was the standard course of treatment for Plaintiff's particular circumstance and were within Dr. Moore's sound medical judgment. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703; *see also Estelle*, 429 U.S. at 107 (1976) ("[T]he question whether an X-ray or additional

[6] In his opposition brief, Plaintiff appears to misinterpret Dr. Moore's declaration as suggesting that the hematoma would not have been visible to Dr. Moore. *See* ECF No. 240 at 2–3. But Dr. Moore is attesting that a skull depression underneath a hematoma would not have been visible on physical examination.

diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."). Similarly, "[a] prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill*, 657 F.3d at 123 (citing *Estelle*, 429 U.S. at 106–07). While a medical provider may be deliberately indifferent if she "consciously chooses an easier and less efficacious treatment plan" because of, for instance, "ulterior motives" such as monetary incentives, *Chance*, 143 F.3d at 704, Plaintiff makes no allegation—and certainly provides no evidence—that any ulterior motives influenced Dr. Moore's treatment decisions.

Moreover, "[t]he judgment of prison doctors is presumed valid unless the prisoner provides evidence that the decision was 'such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment.'" *Harnage v. Lightner*, No. 3:17-CV-263 (AWT), 2019 WL 319395, at *7 (D. Conn. Jan. 24, 2019) (quoting *Nails v. Laplante*, 596 F. Supp. 2d 475, 480 (D. Conn. 2009)) (citation omitted). Deliberate indifference cannot "be found when a plaintiff 'simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired.'" *Perry v. Rupert*, No. 9:10-CV-1033 (LEK/TWD), 2016 WL 11478229, at *9 (N.D.N.Y. Apr. 19, 2016) (citation omitted).

Plaintiff has not submitted any evidence, other than his own speculation, that Dr. Moore's decision to order a CT scan over an MRI was a substantial departure from accepted professional judgment. Instead, the record demonstrates that Plaintiff simply disagreed with the treatment Dr. Moore provided and desired a different method of treatment (an MRI instead of a CT scan). This is insufficient to sustain an Eighth Amendment claim. *See Wright v. Martin*, No. 23-7762-PR, 2025 WL 1091221, at *3 (2d Cir. Apr. 8, 2025) (finding that, although plaintiff experienced pain

intermittently for years, defendants' medical judgment to continue with medication to treat plaintiff's abdominal pain, rather than order an MRI, did not support an inference of deliberate indifference because neither defendant had reason to believe that the pain posed an excessive risk to health or safety); *see also Smalls v. Wright*, 807 F. App'x 124, 126 (2d Cir. 2020) (summary order) (holding that the doctor's "decisions not to order an MRI and not to refer [the plaintiff] to a specialist constitute matters of medical judgment that do not give rise to an Eighth Amendment violation"). Moreover, the medical records demonstrate that, not only was Plaintiff provided with a CT scan within one hour of arrival at UConn, but Dr. Moore also performed an ultrasound of Plaintiff's left eye and scheduled him to see the ophthalmologist the next day. ECF No. 203-4 at 10, 15, 19–21.

There is also no evidence that Plaintiff's condition was exacerbated or worsened in any way by the decision to order a CT scan for Plaintiff's head trauma, rather than an MRI. In fact, none of the documentary evidence shows that Dr. Moore acted recklessly, or that Dr. Moore was aware that her actions or inactions subjected or could have subjected Plaintiff to a serious risk of harm. As such, the Court finds that no reasonable jury could conclude that Dr. Moore was deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment.

*3. Nurse McMahon, Dr. Sibley, and PA Roy*

For the same reasons that no reasonable jury could conclude that Dr. Moore was deliberately indifferent, the Court finds that no reasonable jury could conclude that Nurse McMahon, Dr. Sibley, and PA Roy were deliberately indifferent. As discussed, Plaintiff's claim proceeded against these Defendants on the basis that PA Roy had only provided IV fluids after Plaintiff had requested them and because these Defendants chose to order a CT scan over an MRI even though it was Plaintiff's second trip to the emergency room. ECF No. 15 at 9–10.

As for Nurse McMahon, he has attested that as an RN, his duties consisted of carrying out, and assisting others in carrying out, orders entered by those with the authority to enter them, such as doctors and physicians assistants, and he did not have the authority to order an MRI, CT scan, or any medication for Plaintiff. McMahon Decl., ECF No. 203-12 ¶¶ 8–9. And in any event, Plaintiff's claims against McMahon (and PA Roy and Dr. Sibley) once again amount to a desire and preference for a different course of treatment, and "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. The decision by a health care provider to use one form of treatment instead of another, in the exercise of medical judgment, does not constitute deliberate indifference to an inmate's medical needs. *Williams v. Mid-State Corr. Facility*, No. 9:17-CV-1287 (TJM) (DJS), 2018 WL 11468022, at *4 (N.D.N.Y. Feb. 2, 2018) (citing *Hills*, 657 F.3d at 123); *see also Rodriguez v. Westchester Cnty.*, No. 23-CV-5265 (NSR), 2024 WL 4390222, at *3 (S.D.N.Y. Oct. 3, 2024) (dismissing Eighth Amendment deliberate indifference claim where Plaintiff had complained he had not received an MRI of his lower back or CT scan of his head after attack by another prisoner because claim amounted to disagreement over treatment).

Like Dr. Moore, both PA Roy and Dr. Sibley have attested that a CT scan is the preferred diagnostic tool for head injuries similar to Plaintiff's because it images bones better than X-rays and can show intercranial bleeding, and that had they thought Plaintiff's condition required an MRI, they would have ordered one. Roy Decl., ECF No. 203-14 ¶¶ 17–19; Sibley Decl., ECF No. 203-16 ¶¶ 11–13. PA Roy and Dr. Sibley also submit that CT scans are read by a radiologist and they rely on the radiologist's written report, which in this case, did not indicate that Plaintiff had a skull fracture. ECF No. 203-14 ¶ 20; ECF No. 203-16 ¶ 14.

PA Roy also submits that although Plaintiff had decreased oral intake due to nausea and vomiting, which could result in decreased urine production, she believed that Plaintiff's condition did not require IV fluids because his creatinine level was not elevated, his blood pressure was not low, and his pulse was not high. ECF No. 203-14 ¶¶ 10–11. IV fluids are not administered simply because they are requested by a patient. *Id.* ¶ 13. Nevertheless, after five hours, PA Roy ordered IV fluids for Plaintiff. *Id.* ¶ 14. Had his medical condition indicated that he needed IV fluids before then, she would have ordered them earlier. *Id.* ¶ 15. Furthermore, PA Roy also ordered bloodwork for Plaintiff, and Reglan and Toradol injections, which he refused, so she prescribed him Tylenol, Ibuprofen, and Zofran instead. Pl.'s Med. Rec., ECF No. 203-5 at 12–13, 23–26.

Plaintiff has not provided any evidence to show that PA Roy's or Dr. Sibley's treatment of his head injury was a deliberate or conscious decision to choose an easier or less efficacious route based on ulterior motives; nor has he submitted any evidence to show that the decision to order a CT scan over an MRI, or to fail to administer IV fluids earlier on his second visit to the emergency department, were departures from accepted professional judgment, aside from his own perception that his treatment should have been different. *See Rodriguez*, 2024 WL 4390222, at *3.

Accordingly, the Court finds that there is no evidence in the record to suggest that Nurse McMahon, PA Roy, or Dr. Sibley were aware of a substantial risk of harm to Plaintiff's health and disregarded that risk.[7] Thus, the Court concludes that no reasonable jury could find that these Defendants acted with the requisite culpable state of mind to support an Eighth Amendment

[7] Plaintiff states that Dr. Sibley had documented that there was "No 'NEW' intracranial bleeding and that a 'subdural hematoma' visualized on a cat scan done that day." ECF No. 3. The new CT scan was ordered to "rule out subdural hematoma that may have developed." ECF No. 203-5 at 7. The medical record states: "No new intracranial bleeding/subdural hematoma visualized on repeat heat CT done today." ECF No. 203-5 at 17. To the extent Plaintiff suggests that Dr. Sibley was reporting that he had previously had a subdural hematoma by her use of the word "new," these claims are wholly inaccurate. As Defendants emphasize, there is no evidence in the record to suggest that Plaintiff ever had a subdural hematoma or brain bleed. ECF No. 241 at 3. Instead, he had a subcutaneous hematoma. ECF No. 203-4 at 25.

deliberate indifference claim, and summary judgment must be granted in favor of Defendants Moore, McMahon, Roy, and Sibley on this claim.

B. Eighth Amendment Conspiracy Claim

Defendants are also entitled to summary judgment on Plaintiff's conspiracy claim.

The Court allowed Plaintiff's conspiracy claim to proceed against Dr. Moore, PJ Ajce, Nurse Belanger, and Dr. Gibson. *See* ECF No. 15 at 11–12. To sustain a claim for conspiracy to violate constitutional rights under § 1983, the plaintiff must show: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). A plaintiff must allege facts showing "that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (noting that a § 1983 conspiracy claim is properly alleged under § 1985; citation omitted). Thus, the complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

"It is well settled that claims of conspiracy containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights [are insufficient to state a claim upon which relief can be granted]." *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011); *see also Storck v. Suffolk Cnty. Dep't of Soc. Servs.*, 62 F. Supp. 2d 927, 940 (E.D.N.Y. 1999) (plaintiff must "allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the alleged conspiracy") (citation omitted). "Moreover, a conspiracy claim under Section 1983 requires a plaintiff to state an underlying violation of constitutional rights." *Anderson v. Cnty. of Westchester*, No. 25-CV-8507

(KMK), 2026 WL 1295853, at *4 (S.D.N.Y. May 11, 2026); *see also Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009), *as amended* (Oct. 7, 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails.").

Plaintiff alleges that he complained to Nurse Belanger of a migraine headache, nausea, dizziness, and "a huge black spot in his memory[,]" but Nurse Belanger listed a headache as his only complaint, noted that he denied dizziness or lightheadedness, and allegedly falsely recorded that Plaintiff had not been sure whether he lost consciousness. ECF No. 14 at 7 ¶¶ 6–7. Plaintiff also claims that Dr. Moore, PA Ajce, and Nurse Belanger failed to accurately record his complaints and failed to note that he had a large skull depression under his hematoma. *Id*. Plaintiff further alleges that Dr. Gibson's reason for correcting the December 9, 2021, X-ray report to note that any reference to "a depressed skull fracture identified" was a scrivener's error was for the purpose of conspiring with the other medical Defendants to protect them from liability, ECF No. 14 at 8 ¶ 15, and to conspire with the DOC to cover up the assault, *id.* at 10 ¶ 18.

Plaintiff's conspiracy claims against Defendants Moore, PA Ajce, Nurse Belanger, and Dr. Gibson are not supported by evidence. First, there are no Section 1983 claims remaining in this action, and thus, summary judgment must be granted in favor of Defendants on this basis because conspiracy cannot constitute an independent claim. *See Droz*, 580 F.3d at 109; *Hone v. Delisle*, No. 9:26-CV-1076 (ECC/DJS), 2026 WL 2389172, at *6 (N.D.N.Y. Aug. 17, 2026) (dismissing conspiracy claim where no underlying § 1983 claims remained); *Hamza v. Kotsidis*, No. 1:25-CV-1429 (ECC/ML), 2026 WL 1296172, at *6 (N.D.N.Y. May 12, 2026) ("[T]o the extent Plaintiffs have failed to plausibly allege an underlying violation of their constitutional rights, they cannot sustain a claim of conspiracy to violate those rights."). Second, Plaintiff has not presented any evidence other than speculation and conclusory allegations to show that any of these Defendants

"entered into an agreement, express or tacit," to violate his civil rights. *See Webb*, 340 F.3d at 110.

Finally, Plaintiff alleges his conspiracy claim in wholly conclusory terms. There is no evidence that Plaintiff had a large skull depression under his hematoma. Defendants could not have acted to cover up any Eighth Amendment deliberate indifference by failing to document a large skull depression or skull fracture because one did not exist for them to document. Moreover, contrary to Plaintiff's allegation, Nurse Belanger did document that Plaintiff had lost consciousness. *See* ECF No. 203-4 at 11 (reporting "LOC," which means loss of consciousness). Her failure to document complaints of dizziness or lightheadedness, and Dr. Moore's and PJ Ajce's alleged failure to document other symptoms, is too conjectural to create an inference of a conspiracy to inflict a constitutional violation.

It is also worth noting that these Defendants recorded the extent of Plaintiff's injuries by documenting that Plaintiff presented with an "extremely large hematoma underlying his left eye," that he had reported that his left eye was "blurrier than normal[,]" that Plaintiff had a large abrasion and swelling above left eye and to left side of forehead, and that Plaintiff had "significant pain in his head[,] especially on the left side where he ha[d] a large hematoma." ECF No. 203-4 at 8, 11. Likewise, there is no evidence that Plaintiff suffered a skull fracture, and thus, no evidence that Dr. Gibson fabricated Plaintiff's medical records as part of a conspiracy. Moreover, Plaintiff's allegations that Dr. Gibson conspired with the DOC to minimize and cover up Plaintiff's injuries to limit the DOC's liability for Plaintiff's assault are once again too conclusory, vague, and general for a plausible conspiracy claim.

Therefore, the Court concludes that no reasonable jury could find that these Defendants conspired to violate Plaintiff's constitutional rights, and summary judgment must be granted in favor of Defendants Dr. Moore, PJ Ajce, Nurse Belanger, and Dr. Gibson on this claim.

The Court need not address Defendants' qualified immunity argument, given that it has held no reasonable jury could find a constitutional violation on this record. *See Duamutef v. Hollins*, 297 F.3d 108, 113 n.1 (2d Cir. 2002) ("That is, once we decide that there is no constitutional violation, there typically is no need to address whether defendants are also protected by qualified immunity—although qualified immunity becomes obvious at that point.").

## V. CONCLUSION

For the reasons described explained in this ruling, Defendants' Motion for Summary Judgment, ECF No. 203, is **GRANTED** as to all claims against Defendants Dr. Moore, PA Ajce, Nurse Belanger, PA Roy, Dr. Sibley, Nurse McMahon, and Dr. Gibson. The Clerk is directed to enter judgment for Defendants and close this case.

**SO ORDERED** at Hartford, Connecticut, this 28th day of September, 2026.

*/s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE